UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| TERUMO AMERICAS HOLDING, INC., | ) ) ) ) |  |
| Plaintiff and Counterclaim-Defendant, | ) ) ) ) |  |
| v. | ) ) ) | Civil Action No. 14-13838-DJC |
| GARY D. TURESKI, in his capacity as Seller's Representative, | ) ) ) ) ) |  |
| Defendant and Counterclaim-Plaintiff. | ) ) ) ) |  |

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                                                                               **July 27, 2015**

**I.     Introduction**

Plaintiff and Counterclaim-Defendant Terumo Americas Holding, Inc. ("Terumo"), a Delaware corporation, brings this declaratory judgment action pursuant to 28 U.S.C. §§ 2201-2202 against Defendant and Counterclaim-Plaintiff Gary D. Tureski ("Tureski"), in his capacity as Seller's Representative, seeking a declaration of the parties' rights and obligations pursuant to an Agreement and Plan of Merger (the "Agreement") entered into by the parties on April 1, 2011. D. 1. Terumo has moved for judgment on the pleadings on its declaratory judgment claim. D. 21. For the reasons discussed below, the Court ALLOWS Terumo's motion.

**II.    Standard of Review**

Rule 12(c) of the Federal Rules of Civil Procedure provides that a party may move for judgment on the pleadings after the pleadings have closed. Fed. R. Civ. P. 12. "A motion for

judgment on the pleadings is treated much like a Rule 12(b)(6) motion to dismiss." Pérez–Acevedo v. Rivero–Cubano, 520 F.3d 26, 29 (1st Cir. 2008) (citing Curran v. Cousins, 509 F.3d 36, 43–44 (1st Cir. 2007)). "A Rule 12(c) motion nonetheless differs from a Rule 12(b)(6) motion because it implicates the pleadings as a whole." Santiago v. Bloise, 741 F. Supp. 2d 357, 360 (D. Mass. 2010) (citation and internal quotation mark omitted). Facts in the answer, however, "are taken as true only where and to the extent that they have not been denied or do not conflict with those of the complaint." Id. (citation omitted).

To survive a Rule 12(c) motion, "a complaint must contain factual allegations that 'raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true . . . .'" Pérez-Acevedo, 520 F.3d at 29 (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)). The Court must consider the well-pleaded facts "in the light most favorable to the non-moving party" and "draw[] all reasonable inferences in its favor." Gray v. Evercore Restructuring L.L.C., 544 F.3d 320, 324 (1st Cir. 2008) (citing Curran, 509 F.3d at 43). In reviewing the motion, the Court may also "consider 'documents the authenticity of which are not disputed by the parties; . . . documents central to plaintiffs' claim; [and] documents sufficiently referred to in the complaint.'" Curran, 509 F.3d at 44 (omission and alteration in original) (quoting Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993)).

**III.   Factual Background**

Unless otherwise indicated, the Court relies on the facts as alleged in the complaint, D. 1, and, to the extent they are not disputed, the facts contained in Tureski's answer, D. 7.[1]

---

[1] In his opposition to the motion, Tureski argues that the Court should disregard two letters submitted by Terumo in support of its motion for judgment on the pleadings – one of which is also referenced in the complaint – because "the letters are outside the pleadings . . . ." D. 24 at 12 n.5. Tureski does not appear to contest the documents' authenticity, however, and, as noted above, the Court may consider "documents the authenticity of which are not disputed by

### A. Harvest's CLI Pivotal Clinical Trial

Harvest Technologies, Inc. ("Harvest") is an "an innovative biotechnology company." D. 1 ¶ 10. Harvest was founded in 1995 in Plymouth, Massachusetts and "provides bone marrow aspirate concentrate ("BMAC") systems to treat vascular, orthopedic, and cardiovascular diseases." D. 7 ¶ 13. Relevant to this action, Harvest is "conducting clinical research exploring the treatment of end-stage Critical Limb Ischemia ("CLI"), a result of peripheral artery disease, which often leads to lower-limb amputation and increased patient morbidity and mortality rates." D. 1 ¶ 11. Specifically, Harvest has been working to develop a non-surgical treatment for CLI, and, on February 5, 2011, Harvest submitted a CLI Development Plan (the "Plan") to the FDA to study the use of Harvest's BMAC system to treat patients with CLI. D. 7 ¶ 14. The Plan provided for a 210-patient clinical trial (the "CLI Pivotal Clinical Trial") to study the safety and efficacy of Harvest's CLI treatment. Id. ¶ 15. On March 3, 2011, the FDA approved Harvest's Plan. Id.; D. 23 at 9. Patient enrollment began in June 2011. D. 7 ¶ 31.

### B. Terumo Acquires Harvest

On April 1, 2011, Terumo and certain selling stockholders (the "Sellers") of Harvest entered into an agreement for Terumo to acquire 100% of Harvest's outstanding shares. D. 1 ¶¶ 1, 10. Tureski was designated, and remains, the Seller's representative in connection with the Agreement. Id. ¶¶ 1, 6. The Agreement was signed less than a month after the FDA approved the CLI Pivotal Clinical Trial and before any patients began enrolling in the program.

---

the parties; . . . documents central to plaintiffs' claim; [and] documents sufficiently referred to in the complaint." Curran, 509 F.3d at 44 (omission and alteration in original). "This is true even when the documents are incorporated into the movant's pleadings." Id. (citation omitted). Accordingly, the Court declines to strike them, but did not rely upon them for its ruling on this motion.

D. 7 ¶¶ 15-16, 31.  As such, negotiations included discussion regarding the potential outcome of the Plan and the prospects of FDA approval.  D. 7 ¶ 3, 19.

In an attempt to allocate the potential risks and rewards associated with the potential of FDA approval, Terumo agreed to pay the Sellers $70,000,000 in base consideration, D. 7-1 at 4, 6, and up to $35,000,000 in Earnout Payments upon completion of several Plan milestones, D. 7 ¶ 20.  Specifically, Terumo agreed to pay an additional $5,000,000 upon completion of patient enrollment in the CLI Pivotal Clinical Trial, if enrollment was completed prior to the seventh anniversary of the Closing Date (i.e., April 2018).  Id. ¶ 28 (quoting Agreement, § 1.6(a)(i)).  In the event of a breach as described in the Agreement, the Earnout Payments become immediately payable to Sellers.  Id. ¶ 30 (citing Agreement, § 1.6(e)).

    C.    **Pertinent Provisions of the Agreement**

Pursuant to section 1.6(c)(ii) of the Agreement, Terumo agreed to use "Commercially Reasonable Efforts to effectuate and fund the CLI Development Plan."  D. 1 ¶ 13 (quoting Agreement, § 1.6(c)(ii)).  The relevant section of the Agreement provides, in part:

> (ii) the Purchaser [Terumo] and the Surviving Corporation agree to use Commercially Reasonable Efforts to effectuate and fund the CLI Development Plan with a commitment to provide up to $6,000,000 in funding for the CLI Development Plan (whether approval is sought DeNovo 510(k) or PMA), unless a recommendation is made by the Data Safety and Monitoring Board to materially modify or stop the related clinical trial for safety reasons . . . .

Agreement, D. 7-1 at 14-15.  The term "Commercially Reasonable Efforts" is defined in the Agreement as follows:

> (xi) "Commercially Reasonable Efforts" means the level of efforts and resources (provided that the Purchaser [Terumo] shall not be required to provide the Surviving Corporation with more than $6,000,000 in funding for the CLI Development Plan or more than $600,000 in funding for the MYO Development Plan) at least equal to those normally used by the Purchaser and its Affiliates, taken as a whole, to conduct the relevant activity in an expeditious manner, including, in the case of development, manufacture or commercialization, the

> level of effort and resources at least equal to those normally used to develop, manufacture or commercialize, as the case may be, a product that has been developed internally, which product is at a similar stage in its development or product life and is of a similar market and profitability potential to the products and/or treatments addressed in this Section 1.6.

Id. at 12.  In addition, the CLI Development Plan was to be "directed within its scope by the Plan Manager."  D. 1 ¶ 12 (quoting Agreement, § 1.6(b)(v)).  At all relevant times, Tureski has been the designated Plan Manager.  Id. (quoting Agreement, § 1.6(b)(xxvi)).

### D. Terumo Stops Enrollment in the CLI Pivotal Clinical Trial

The parties acknowledge that enrollment in the CLI Pivotal Clinical Trial was slower than anticipated and that enrollment had not been completed more than eighteen months after the parties had initially anticipated.  D. 7 ¶¶ 21, 31; see D. 23 at 13.  On June 17, 2014, Tureski was notified that, in the three years since Terumo acquired Harvest, Terumo incurred expenses in excess of $6,000,000 in connection with the Plan and that Terumo had decided to stop enrolling new patients in the CLI Pivotal Clinical Trial.  D. 1 ¶¶ 3, 16.  At the time Terumo decided to stop enrolling new patients, there were 93 patients participating in the CLI Pivotal Clinical Trial – twelve patients short of completing enrollment, but less than half of the targeted 210 patients.  D. 7 ¶ 47.  Although new patients are no longer being enrolled, the CLI Pivotal Clinical Trial remains active and Terumo continues to provide funding.  D. 1 ¶ 16.  Terumo made the decision to stop enrolling new patients based, in part, on its understanding that it had satisfied its obligations to fund the Plan under the terms of the Agreement.  Id. ¶ 17.  Since Terumo notified Tureski of its decision, however, a dispute has arisen as to whether the expenditure of $6,000,000 in funding satisfies the terms of the Agreement.  Id. ¶ 18.

### IV. Procedural History

Terumo instituted this action on October 10, 2014 seeking a declaration of its rights and

obligations under the Agreement. D. 1. Specifically, Terumo seeks a declaration that it: "(i) is not obligated to further fund the CLI Development Plan upon incurring expenditures that would exceed $6,000,000 and (ii) the effect of the parenthetical clause in the contractually-defined term Commercially Reasonable Efforts is one of limitation which modifies the scope of that phrase and only obligates Terumo to provide up to $6,000,000 in funding for the CLI Development Plan." Id. ¶ 4. On November 17, 2014, Tureski filed an answer asserting counterclaims for breach of contract for failure to use commercially reasonable efforts (Count I) and for failure to comply with Tureski's request for information (Count II), for a declaratory judgment that "(i) Terumo did not use Commercially Reasonable Efforts to effectuate and fund the CLI Development Plan; (ii) Terumo improperly terminated the Plan and failed to cure its breaches within 30 days of notice, and (iii) Terumo is obligated to pay $35,000,000 in additional consideration to the Sellers, together with interest at the rate of 1.5% per month and the Sellers' cost of collection including reasonable legal fees and expenses as provided in the Agreement" (Count III) and for specific performance (Count IV). D. 7. Terumo has now moved for judgment on the pleadings on its declaratory judgment claim. D. 21. The Court heard the parties on the pending motion and took this matter under advisement. D. 32.

**V.    Discussion**

"A court applying Delaware law to interpret a contract is to effectuate the intent of the parties." [2] JFE Steel Corp. v. ICI Americas, Inc., 797 F. Supp. 2d 452, 469 (D. Del. 2011). Under Delaware law, "[t]he starting point of contract construction is to determine whether a provision is ambiguous, i.e. whether it is reasonably subject to more than one interpretation." NBC Universal v. Paxson Commc'ns Corp., No. 650-cv-N, 2005 WL 1038997, at *5 (Del. Ch.

---

[2] The parties do not dispute that Delaware law governs the interpretation of the Agreement. D. 23 at 12; D. 24 at 11 n.4.

6

Apr. 29, 2005) (citation omitted). "[A] determination of whether a contract is ambiguous is a question for the court to resolve as a matter of law." Id. A contract is not ambiguous simply because the parties "do not agree upon its proper construction." Id. (citation omitted). Rather, contract language is ambiguous "only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." Id. (citation omitted). "If the language of the contract is unambiguous, the Court interprets the contract based on the plain meaning of the language contained on the face of the document." JFE Steel, 797 F. Supp. 2d at 469. "Judgment on the pleadings . . . is a proper framework for enforcing unambiguous contracts because there is no need to resolve material disputes of fact." NBC Universal, 2005 WL 1038997, at *5.

To interpret a contract, Delaware law "require[s] the Court to read a contract as a whole and give each provision and term effect, so as not to render any part of the contract mere surplussage." JFE Steel, 797 F. Supp. 2d at 469 (citation and internal quotation marks omitted). "Delaware adheres to the 'objective' theory of contracts, i.e. a contract's construction should be that which would be understood by an objective, reasonable third party." NBC Universal, 2005 WL 1038997, at *5. Therefore, contract terms "will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language." Id. (citing Eagle Indus., Inc. v. DeVilbiss Health Care, Inc., 702 A.2d 1228, 1232 (Del. 1997)). Furthermore, "when two sophisticated parties bargain at arm's length and enter into a contract, the presumption is even stronger that the contract's language should guide the Court's interpretation." JFE Steel, 797 F. Supp. 2d at 469 (citing Progressive Int'l Corp v. E.I. du Pont de Nemours & Co., No. C.A. 19209, 2002 WL 1558382, at *6–7 (Del. Ch. July 9, 2002)).

Here, Terumo seeks a declaration that, as a matter of law, the $6,000,000 funding commitment contained in section 1.6(c)(ii) of the parties' Agreement represents the maximum funding amount required with regard to the CLI Development Plan and that the effect of the parenthetical clause in the defined term "Commercially Reasonable Efforts" is one of limitation, modifying the scope of that phrase, and only obligates Terumo to provide up to $6,000,000 in funding for the CLI Development Plan.  D. 23 at 15; see D. 25-1 at 5-6 (noting that "Tureski may dispute whether Terumo properly calculated the expenditures, but all that Terumo seeks . . . is this Court's declaration that the $6,000,000 represents the upper extent of the Section 1.6(c)(ii) financial undertaking").[3]  Tureski disputes Terumo's interpretation and raises four counterclaims under the Agreement.  D. 7.

### A. The CLI Development Plan is Subject to a Maximum Funding Commitment of $6,000,000

Here, the operative language is the phrase "up to" contained in section 1.6(c)(ii) of the Agreement, which provides that that Terumo and Harvest collectively agreed "to use Commercially Reasonable Efforts to effectuate and fund the CLI Development Plan with a commitment to provide up to $6,000,000 in funding for the CLI Development Plan."  Agreement

---

[3] Tureski correctly points out that the phrasing of the declaration sought by Terumo changed slightly from the complaint to the motion for judgment on the pleadings.  See D. 24 at 13 n.6.  In the complaint, Terumo requested a declaration that:  "Terumo (i) is not obligated to further fund the CLI Development Plan upon incurring expenditures that would exceed $6,000,000 and (ii) the effect of the parenthetical clause in the contractually-defined term Commercially Reasonable Efforts is one of limitation which modifies the scope of that phrase and only obligates Terumo to provide up to $6,000,000 in funding for the CLI Development Plan."  D. 1.  In Terumo's motion and all supporting papers, the first prong changes slightly to "(i) the CLI Development Plan is subject to a maximum funding commitment of $6,000,000."  See, e.g., D. 21.  Tureski argues that Terumo should not be allowed to modify the declaratory relief sought in this way, D. 24 at 13 n.6; D. 29-1 at 4 n.2, however, where, as here, the parties have fully briefed and argued the issue and further agree that the Agreement is unambiguous, the Court will allow Terumo to argue for the declaration that "would be of practical assistance in setting the underlying controversy to rest."  State of Rhode Island. v. Narragansett Indian Tribe, 19 F.3d 685, 693 (1st Cir. 1994).

§ 1.6(c)(ii), D. 7-1 at 14-15. This phrase is clear and unambiguous and, therefore, must be interpreted according to its ordinary and usual meaning.[4] JFE Steel, 797 F. Supp. 2d at 469 (citations omitted). The ordinary meaning of "up to" is one of limitation, implying a maximum cap or limit. See, e.g., Treischel v. Astrue, No. 11-cv-242 JJK, 2012 WL 473467, at *13 (D. Minn. Feb. 14, 2012) (interpreting the words "up to" to indicate "an upper limit, or maximum"); see also Schefke v. Reliable Collection Agency, Ltd., 32 P.3d 52, 68 (Haw. 2001), as amended (Oct. 11, 2001) (examining various dictionaries and concluding that "[t]he phrase 'up to' is defined as 'to the limit of,'" or "'as many as: as much as,'" and that the phrase is "used as a function word to indicate a limit or boundary"); Kipp v. Kipp, 844 So. 2d 691, 693 (Fla. Dist. Ct. App. 2003) (holding that "[t]he phrase 'up to' is a phrase of limitation used to set a cap or maximum amount contract"). Notably, Tureski does not proffer an alternative interpretation of the "up to" language contained in section 1.6(c)(ii). Read in context, this limiting language modifies the defined term "Commercially Reasonable Efforts," setting a maximum funding cap of $6,000,000. The Court agrees with Terumo, therefore, that, under a plain reading, the "up to $6,000,000" language contained in section 1.6(c)(ii) serves to limit Terumo's and Harvest's financial obligation to the CLI Development Plan to a maximum of $6,000,000.

This interpretation is further supported by examining section 1.6(c) as a whole. As Terumo points out, section 1.6(c) includes three provisions in which Terumo and Harvest agree to use "Commercially Reasonable Efforts." D. 7-1 at 14-15. Only one of these sections includes an express monetary cap. Id. Section 1.6(c) provides, in relevant part:

---

[4] The Court notes that neither party argues that the Agreement is ambiguous. See D. 24 at 5 (arguing that "[t]he Agreement clearly and unambiguously delineates the respective rights and obligations of the Parties"); D. 25-1 at 3 (noting that "neither party contends that the disputed provisions in the Agreement render them ambiguous").

9

  (ii) the Purchaser and the Surviving Corporation agree to use Commercially Reasonable Efforts to effectuate and fund the CLI Development Plan with a commitment to provide up to $6,000,000 in funding for the CLI Development Plan (whether approval is sought DeNovo 510(k) or PMA), unless a recommendation is made by the Data Safety and Monitoring Board to materially modify or stop the related clinical trial for safety reasons,

  (iii) the Purchaser and the Surviving-Corporation agree to use Commercially Reasonable Efforts to effectuate the MYO Development Plan; provided that the Surviving Corporation or Purchaser may terminate the MYO Development Plan by written notice to the Plan Manager delivered within 90 days after receipt by the Purchaser of the data and results from the MYO Trial, if the Surviving Corporation or the Purchaser is not satisfied in its sole-discretion with the results such MYO Trial,

  (iv) the Purchaser and-the Surviving Corporation agree to use Commercially Reasonable Efforts to commercialize the Products, if any . . . .

Id. These sections represent a range of bargained for risks and financial commitments.

  Unlike section 1.6(c)(ii), sections 1.6(c)(iii) and (iv) do not identify any express monitory caps. As such, under a plain reading of those sections, Terumo and Harvest are required to use "Commercially Reasonable Efforts" to effectuate the MYO Development Plan and to commercialize the resulting products. Id. at 12, 15. Despite not containing an express funding cap, however, section 1.6(c)(iii) is the most permissive of the provisions, allowing Harvest or Terumo to terminate the MYO Development Plan if "in its sole discretion" it is not satisfied with the results of that trial. Id. at 15. Section 1.6(c)(iv) does not include any monetary cap or a performance out. Id. Taken together, these provisions demonstrate the parties' intent to tailor each provision to address differing levels of risk by requiring different levels of commitment. While section 1.6(c)(ii) does not provide Terumo and Harvest as much flexibility as section 1.6(c)(iii) (and less flexibility than section 1.6(c)(iv)), the inclusion of the "up to $6,000,000 in funding" language places a limit on Harvest's and Terumo's obligation to fund the CLI Development Plan, presumably in an attempt to allocated the risks associated with the prospects of that particular program. The Court agrees with Terumo that any other reading would fail to

give effect to the "up to" language, "which the parties specifically included in this – and no other – provision in Section 1.6(c)." D. 23 at 22.

### B. The Parenthetical Clause in the Defined Term "Commercially Reasonable Efforts" Only Obligates Terumo to Provide Up to $6,000,000 in Funding for the CLI Development Plan

Terumo also seeks a declaration that the effect of the parenthetical clause in the defined term "Commercially Reasonable Efforts" is one of limitation, modifying the scope of that phrase and only obligating Terumo to provide up to $6,000,000 in funding for the CLI Development Plan. D. 23 at 12. In contrast, Tureski argues that the "Commercially Reasonable Efforts" provision controls section 1.6(c)(ii) and serves to expand Terumo's obligations under that section. D. 24 at 13-21. Specifically, Tureski argues that the "Commercially Reasonable Efforts" definition gives Terumo dual obligations with respect to the CLI Development Plan and mandates that the $6,000,000 funding requirement is Terumo's obligation alone. Id. at 15, 19.

As noted above, section 1.6(c)(ii) provides, in relevant part, that "the Purchaser and the Surviving Corporation agree to use Commercially Reasonable Efforts to effectuate and fund the CLI Development Plan with a commitment to provide up to $6,000,000 in funding for the CLI Development Plan." D. 7-1 at 14-15. "Commercially Reasonable Efforts" is a contractually negotiated term, defined in part as "the level of efforts and resources (provided that the Purchaser shall not be required to provide the Surviving Corporation with more than $6,000,000 in funding for the CLI Development Plan or more than $600,000 in funding for the MYO Development Plan) at least equal to those normally used by the Purchaser and its Affiliates . . . ." Id. at 12.

As a threshold matter, the Court notes that both provisions incorporate express $6,000,000 funding limits, further signifying the parties' intent to incorporate such a funding cap. NBC Universal, 2005 WL 1038997, at *6 (explaining that "[i]n discerning the intent of the

11

parties, the [Agreement] should be read as a whole and, if possible, interpreted to reconcile all of the provisions of the document"). Tureski does not attempt to reconcile these similarities. Instead, Tureski first focuses on the phrase "efforts and resources," arguing that, by its plain language, section 1.6(b)(xi) contains dual obligations: "(1) the requirement that Terumo use a requite level of efforts; and (2) the requirement that Terumo use a requisite level of resources." D. 24 at 15. Tureski further argues that the parenthetical clause in section 1.6(b)(xi) should be read to modify the resource obligation only. Id. at 17.

While the Court agrees with Tureski that the words "efforts" and "resources" may indicate the parties' intention to include two discrete requirements, the Court does not agree that the parenthetical was intended to modify only the second obligation. Even assuming that the parenthetical only modified the second obligation (i.e. resources), however, under a plain reading of the Agreement, Terumo's funding (as opposed to "effort") obligations would nevertheless be satisfied upon incurring expenditures in excess of $6,000,000. And although it may be possible for a commercial entity to expend "resources" without expending "efforts," it is unclear how a corporation could expend "efforts equal to those normally used," as required by section 1.6(b)(xi), without expending any "resources." Reading the Agreement as a whole, the parties' use of the $6,000,000 limit across clauses indicates their intention to limit Terumo's obligations regarding the CLI Development Plan such that upon incurring more than $6,000,000 in expenses Terumo's obligation to use "Commercially Reasonable Efforts" – whether efforts or resources – would cease. E. I. du Pont de Nemours & Co. v. Green, 411 A.2d 953, 956 (Del. 1980) (noting that "[w]hen the sense of the entire act requires that a qualifying word or phrase apply to several preceding or succeeding sections, the word or phrase will not be restricted to its immediate antecedent").

Tureski may dispute that Terumo expended the necessary level of effort prior to reaching the funding cap or that Terumo improperly calculated expenditures, but all that Terumo seeks here is a declaration that $6,000,000 represents the maximum financial commitment required under section 1.6(c)(ii) and the parenthetical clause in the "Commercially Reasonable Efforts" definition is one of limitation. D. 23 at 15. Tureski remains free to argue that before satisfying its funding obligations Terumo breached its obligation to use the level of effort "at least equal to those normally used." See Agreement, D. 7-1 at 12.

Finally, Tureski argues that "Terumo improperly conflates its own obligations under the Agreement with those of Harvest." D. 24 at 19. The Agreement contains both a collective commitment by Terumo and Harvest to fund the CLI Development Program – § 1.6(c)(ii) – and a funding cap on the amount Terumo is required to commit to the CLI Development Program – § 1.6(b)(xi). Specifically, section 1.6(c)(ii) provides that the "Purchaser [Terumo] and the Surviving Corporation agree to use Commercially Reasonable Efforts to effectuate and fund the CLI Development Plan with a commitment to provide up to $6,000,000 in funding for the CLI Development Plan," D. 7-1 at 14-15, while the parenthetical in section 1.6(b)(xi) provides that "the Purchaser shall not be required to provide the Surviving Corporation with more than $6,000,000 in funding for the CLI Development Plan," id. at 12. Tureski argues that section 1.6(b)(xi) should be read to control section 1.6(c)(ii). D. 24 at 19. Therefore, Tureski contends that the Court should read the Agreement to disallow the combination of Harvest's and Terumo's expenditures to determine whether the funding obligation has been satisfied. Id. Tureski does not attempt reconcile the insertion of Harvest in section 1.6(c)(ii), however, and the Court cannot ignore Harvest's inclusion in the express funding provision, which, under a plain reading, provides that Terumo and Harvest will fund the CLI Development Plan "up to $6,000,000." D.

13

7-1 at 14-15. Taken as a whole then, the Agreement is properly read as guaranteeing a funding commitment of $6,000,000 to the CLI Development Plan in total, while simultaneously reiterating that Terumo would not be expected to exceed the maximum funding commitment of $6,000,000 alone.

Accordingly, the Court concludes that the Agreement unambiguously limits Terumo's and Harvest's obligation to fund the CLI Development Plan to an amount of $6,000,000 and that the effect of the parenthetical clause in the defined term "Commercially Reasonable Efforts" is one of limitation, modifying the scope of that phrase and only obligating Terumo to provide up to $6,000,000 in funding for the CLI Development Plan.

## VI.  Conclusion

For the foregoing reasons, the Court ALLOWS Defendants' motion for judgment on the pleadings, D. 21.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge