UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TERUMO AMERICAS HOLDING, INC., ) <br> ) <br> Plaintiff and ) <br> Counterclaim-Defendant, ) <br> ) <br> v. ) <br> ) <br> GARY D. TURESKI, ) <br> in his capacity as ) <br> Sellers' Representative, ) <br> ) <br> Defendant and ) <br> Counterclaim-Plaintiff. ) <br> ) | Civil Action No. 14-13838-DJC |

## MEMORANDUM AND ORDER

CASPER, J.                                                                                                                                                         May 1, 2017

### I.    Introduction

Plaintiff and Counterclaim-Defendant Terumo Americas Holding, Inc. ("Terumo") has brought this declaratory judgment action against Defendant and Counterclaim-Plaintiff Gary D. Tureski ("Tureski"), in his capacity as Sellers' Representative, seeking a declaration of the parties' rights and obligations pursuant to an Agreement and Plan of Merger (the "Agreement") entered into by the parties on April 1, 2011. D. 1. Tureski has asserted counterclaims against Terumo for breach of contract in failing to use commercially reasonable efforts (Count I) and for failure to comply with the Sellers' Representative's requests for information (Count II). D. 7. Tureski also asserts counterclaims for a declaratory judgment that certain of Terumo's actions were in violation of the Agreement (Count III) and for specific performance in the form of an order directing Terumo

1

to respond to information requests made by the Sellers' Representative (Count IV). Id. Terumo has now moved for summary judgment on all counterclaims against it. D. 125. For the reasons discussed below, the Court ALLOWS Terumo's motion.

## II. Standard of Review

The Court grants summary judgment where there is no genuine dispute on any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A material fact is one that "carries with it the potential to affect the outcome of the suit under the applicable law." García-González v. Puig-Morales, 761 F.3d 81, 87 (1st Cir. 2014) (internal quotation mark omitted) (quoting Newman v. Advanced Tech. Innovation Corp., 749 F.3d 33, 36 (1st Cir. 2014)). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. Rosciti v. Ins. Co. of Pa., 659 F.3d 92, 96 (1st Cir. 2011) (citation omitted). Once that burden is met, the non-moving party may not rest on the allegations or denials in his or her pleadings, Murray v. Warren Pumps, LLC, 821 F.3d 77, 83 (1st Cir. 2016) (citation omitted), but, "with respect to each issue on which [he or she] would bear the burden of proof at trial," must "demonstrate that a trier of fact could reasonably resolve that issue in [his or her] favor," Borges ex rel. S.M.B.W. v. Serrano–Isern, 605 F.3d 1, 5 (1st Cir. 2010) (citations omitted). The Court views the record in the light most favorable to the non-moving party and "draw[s] reasonable inferences" in their favor. Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009) (citation omitted). "Conclusory allegations, improbable inferences, and unsupported speculation," however, are "insufficient to establish a genuine dispute of fact." Travers v. Flight Servs. & Sys., Inc., 737 F.3d 144, 146 (1st Cir. 2013) (internal quotation mark and citation omitted).

### III. Factual Background

Unless otherwise noted, the following facts are drawn from the parties' statements of material facts, D. 127, 131, 141, 147, and are undisputed.

#### A. The Agreement

Terumo and certain selling stockholders of Harvest Technologies, Inc. ("Harvest"), including Tureski, ("the Sellers"), are parties to the Agreement which was entered into on April 1, 2011. D. 127 ¶¶ 1, 3, 15; D. 131 ¶¶ 1, 3, 15. Tureski is a "Seller," the "Sellers' Representative" and the "Plan Manager," as defined in the Agreement. D. 127 ¶¶ 5-7; D. 131 ¶¶ 5-7. Pursuant to the Agreement, Terumo acquired 100% of Harvest's outstanding shares, D. 1 ¶ 10; D. 7 ¶ 10, and the "Transaction Closing" was held on April 29, 2011, D. 127 ¶ 16; D. 131 ¶ 16.

Harvest is "an innovative biotechnology company working to commercialize the world's first point-of-care technology that allows physicians to derive highly concentrated autologous, adult stem cells from their patients in just 15 minutes." D. 1 ¶ 10; D. 7 ¶ 10. When the parties entered into the Agreement, Harvest "was conducting clinical research exploring the treatment of end-stage Critical Limb Ischemia ("CLI"), a result of Peripheral Arterial Occlusive Disease, which often leads to lower-limb amputation and increased patient morbidity and mortality rates." D. 1 ¶ 11; D. 7 ¶ 11. Specifically, Harvest was working to develop treatments using "autologous bioactive cells." D. 7 at 9 ¶ 13; D. 18 ¶ 13. Prior to executing the Agreement, Harvest submitted a "CLI Investigational Plan," as revised ("the Plan"), to the Federal Drug Administration ("FDA"). D. 127 ¶¶ 56-57; D. 131 ¶¶ 56-57. The Plan was approved by the FDA on March 3, 2011. D. 127 ¶ 58; D. 131 ¶ 58. The Plan provided for, among other things, a 210-patient clinical trial (the "CLI Pivotal Clinical Trial") to study the efficacy of Harvest's CLI treatment. D. 7 ¶ 15; D. 18 ¶ 15.

The Plan, referred to in the Agreement as the "CLI Development Plan," is attached to the Agreement as Exhibit 1.6(b)(v). D. 127 ¶ 60; D. 131 ¶ 60.

Terumo paid the Sellers $70 million in "base merger consideration" to acquire Harvest. D. 127 ¶ 17; D. 131 ¶ 17. Pursuant to the Agreement, the Sellers potentially could have earned up to an additional $35 million in "milestone payments" corresponding to the achievement of aspects of the Plan and development of the CLI treatment. D. 127 ¶ 19; D. 131 ¶ 19. For example, the Sellers would be entitled to a $5 million payment "upon completion of enrollment of 105 of the 210 patients" in the CLI Pivotal Clinical Trial and to a $12.5 million payment upon written notice from the FDA of "CLI FDA Clearance/Approval." D. 127 ¶ 19; D. 131 ¶ 19.

Section 1.6(c)(ii) of the Agreement requires Terumo to use "Commercially Reasonable Efforts to effectuate and fund" the Plan "with a commitment to provide up to $6,000,000 in funding for the CLI Development Plan . . . ." D. 127 ¶ 61; D. 131 ¶ 61. Section 1.6(b)(xi) defines "Commercially Reasonable Efforts" as:

> [T]he level of efforts and resources (provided that the Purchaser [Terumo] shall not be required to provide the Surviving Corporation with more than $6,000,000 in funding for the CLI Development Plan or more than $600,000 in funding for the MYO Development Plan) at least equal to those normally used by the Purchaser and its Affiliates, taken as a whole, to conduct the relevant activity in an expeditious manner, including, in the case of development, manufacture or commercialization, the level of effort and resources at least equal to those normally used to develop, manufacture or commercialize, as the case may be, a product that has been developed internally, which product is at a similar stage in its development or product life and is of a similar market and profitability potential to the products and/or treatments addressed in this Section 1.6.

D. 127 ¶ 62; D. 131 ¶ 62.

The Agreement provides that the Plan shall be directed within its scope by the Plan Manager, Tureski, in reasonable consultation with Terumo, D. 141 ¶ 7; D. 147 ¶ 7, and entitles the Plan Manager to certain categories of documents, financial statements and information in

4

possession of Terumo and its affiliates, D. 141 ¶¶ 9-11; D. 147 ¶¶ 9-11. The Plan Manager is obligated to, among other things, "use best efforts to effectuate the CLI Development Plan." D. 127 ¶ 41; D. 131 ¶ 41.

### B. Projections, Negotiations and Modifications of the Agreement

The Agreement was the result of negotiations which included detailed discussions between the parties, see D. 127 ¶ 21; D. 131 ¶ 21, and each party, including Harvest, was represented by counsel, D. 127 ¶¶ 25-27; D. 131 ¶¶ 25-27. Tureski participated in a meeting in New York City in March 2011 to negotiate the Agreement, D. 127 ¶ 22; D. 131 ¶ 22, and multiple drafts of the Agreement with proposed changes to Section 1.6 were circulated between the parties. D. 127 ¶ 23; D. 131 ¶ 23.

Prior to entering into the Agreement and the Transaction Closing date, the parties exchanged various forecasts and "draft plans" regarding Terumo's acquisition of Harvest. See, e.g., D. 141 ¶¶ 14, 26, 30, 34, 37, 60; D. 147 ¶¶ 14, 26, 30, 34, 37, 60. The parties dispute whether certain of those forecasts and draft plans estimating around $6 million in costs for the CLI Pivotal Clinical Trial included "internal Harvest salaries and other internal expenses." See, e.g., D. 141 ¶¶ 18-19, 26, 37, 42-43, 61; D. 147 ¶¶ 18-19, 26, 37, 42-43, 61. Certain draft plans included "Salaries & benefits" and "Travel & Entertainment" under the Sales, General and Administrative expenses ("SG&A") schedule, D. 141 ¶ 51; D. 147 ¶ 51, and a version of a document created in 2011by Harvest's Chief Financial Officer at the time purportedly "budgeted items that were reflective in the contract" lists "Harvest Travel & Misc." as an item, see D. 141 ¶¶ 15, 60-62; D. 147 ¶¶ 15, 60-62.

The Agreement was modified in writing, as required, six times between July 25, 2011 and January 1, 2014. D. 127 ¶¶ 33-39; D. 131 ¶¶ 33-39. In 2012, Tureski was made aware of increasing

5

costs for the CLI Pivotal Clinical Trial and he never asked to amend or modify the $6 million funding obligation in the Agreement. D. 127 ¶¶ 28-30; D. 131 ¶¶ 28-30. Parts of Section 1.6 were modified in writing in 2013, see, e.g., D. 128-16, 128-17, but none of the amendments were with respect to the Plan, D. 127 ¶ 32; D. 131 ¶ 32.

### C. The Clinical Trial

"InVentiv Clinical Solutions ("InVentiv") was the contract resource organization ("CRO") managing the CLI Pivotal Clinical Trial." D. 127 ¶ 127; D. 131 ¶ 127. Patient enrollment in the CLI Pivotal Clinical Trial was slower than expected because, in part, "the inclusion and exclusion criteria set by the FDA were significantly narrower than the pilot program and the severity of the type of patient was at the extreme of the treatment curve." D. 127 ¶¶ 64-65; D. 131 ¶¶ 64-65. Enrollment was also slower than expected because, among other things, "new federal regulation kicked in and the amount of regulation increased," "new surgical procedures were developed" and "there was competition for clinical site centers from other studies by Aastrom and Biomet" where the "Aastrom clinical study was reimbursing 'more than three times what [Harvest was] reimbursing for the study to the hospitals and also making it much easier for the hospitals.'" D. 127 ¶¶ 66-69; D. 131 ¶¶ 66-69.[1] Around December 2011, the per-patient reimbursement for the CLI Pivotal Clinical Trial was increased from $12,000 to $35,000. D. 127 ¶¶ 71-72; D. 131 ¶¶ 71-72. The number of CLI Pivotal Clinical Trial sites was also increased from twenty-five sites. D. 127 ¶ 74; D. 131 ¶ 74. In February 2013, Tureski "guessed" that thirty to thirty-five patients in total had been enrolled in the CLI Pivotal Clinical Trial. D. 127 ¶ 88; D. 131 ¶ 88. The "DeNovo 510K Regulatory Schedule" contained in the Agreement forecasted that enrollment of the 210 patients for the CLI Pivotal Clinical Trial would be complete by March 31, 2013. D. 127 ¶ 89; D.

---

[1] Enrollment in the Aastrom clinical trial ceased around March 2013. D. 127 ¶ 70; D. 131 ¶ 70.

131 ¶ 89. There were not, however, 210 patients enrolled prior to that date. D. 127 ¶ 90; D. 131 ¶ 90.

In the fall of 2013, the parties discussed renegotiation of, at the very least, the first milestone payment, but the payment schedules were never modified in the Agreement. D. 127 ¶¶ 91-97; D. 131 ¶¶ 91-97. In early 2014, Tureski became aware of concerns that the CLI Pivotal Clinical Trial would be cancelled, D. 127 ¶ 99; D. 131 ¶ 99, and in June 2014, Terumo provided Tureski with a copy of analysis indicating that further patient enrollment would cease, D. 127 ¶¶ 101-104; D. 131 ¶¶ 101-104. The analysis also stated that there were $6,497,150 in total expenditures for the PLI Pivotal Clinical Trial. D. 127 ¶¶ 118-22; D. 131 ¶¶ 118-22. This figure includes $4.95 million in "Third Party Expenditures related to CLI Pivotal Clinical Trial," $158,000 in "Third Party Expenditures related to but not yet coded to CLI Pivotal Clinical Trial," $1.2 million in "Payroll Expenses" and $181,000 in "Travel & Entertainment Expenses." D. 127 ¶¶ 118-22; D. 131 ¶¶ 118-22.

In September 2015, Harvest submitted the "Final Clinical Investigation Report" for the CLI Pivotal Clinical Trial to the FDA ("the FDA Report"). D. 127 ¶ 179; D. 131 ¶ 179. The FDA Report stated, among other things, that "the clinical study failed to meet the primary, secondary, or exploratory endpoints with the exception of a statistical improvement in self-reported pain in the treatment group," that "[n]o major safety issues were identified during the study" and that CLI Pivotal Clinical Trial "failed to demonstrate a difference in the primary endpoint between the treatment and placebo groups in the Kaplan-Meier analysis." D. 127 ¶¶ 180-81; D. 131 ¶¶ 180-81. In a September 2015 letter to the FDA, Harvest stated that it "will not be filing an application to market the device based on this data." D. 127 ¶ 187; D. 131 ¶ 187.

## IV. Procedural History

Terumo brought this action on October 10, 2014 seeking a declaration of its rights and obligations under the Agreement relating to the scope of "Commercially Reasonable Efforts" as defined in Section 1.6 of the Agreement. D. 1. In response, Tureski asserted the counterclaims at issue. D. 7. Terumo moved for judgment on the pleadings on its declaratory judgment claim, D. 21, which this Count allowed, D. 60. In allowing Terumo's motion, this Court held that "under a plain reading, the 'up to $6,000,000' language contained in section 1.6(c)(ii) serves to limit Terumo's and Harvest's financial obligation to the CLI Development Plan to a maximum of $6,000,000." Id. at 9. Furthermore, as to Section 1.6(b)(xi), this Court held, in relevant part, that "[r]eading the Agreement as a whole, the parties' use of the $6,000,000 limit across clauses indicates their intention to limit Terumo's obligations regarding the CLI Development Plan such that upon incurring more than $6,000,000 in expenses Terumo's obligation to use 'Commercially Reasonable Efforts' – whether efforts or resources – would cease." Id. at 12 (citation omitted). In doing so, this Court specifically stated that "Tureski may dispute that Terumo expended the necessary level of effort prior to reaching the funding cap or that Terumo improperly calculated expenditures . . . . Tureski remains free to argue that before satisfying its funding obligations Terumo breached its obligation to use the level of effort 'at least equal to those normally used.'" Id. at 13 (citation omitted).

Terumo has now moved for summary judgment on Tureski's counterclaims. The Court heard the parties on the pending motion and took this matter under advisement. D. 149.

## V. Discussion

To succeed on the breach of contract counterclaims under Delaware law[2] Tureski must show: (1) a contractual obligation; (2) breach of that obligation by Terumo; and (3) resulting damage to him. See RoadSafe Traffic Sys., Inc. v. Ameriseal Ne. Florida, Inc., No. 09-cv-148-SLR, 2011 WL 4543214, at *13 (D. Del. Sept. 29, 2011) (citation omitted).

Tureski's breach of contract counterclaim regarding Terumo's failure to use "Commercially Reasonable Efforts" to effectuate and fund the CLI Development Plan (Count I) focuses upon the meaning of the term "funding" in the clause "6,000,000 in funding for the CLI Development Plan." See D. 7 ¶¶ 62-63.[3] This breach of contract counterclaim also concerns Terumo's obligations to consult with the Plan Manager concerning the Plan. See id. ¶¶ 65, 69. Tureski addresses this counterclaim together with his counterclaim for a declaratory judgment that Terumo failed to use Commercially Reasonable Efforts and that Sellers are thus entitled to $35 million in additional consideration according to the Agreement (Count III). D. 140 at 12.

Tureski's breach of contract counterclaim regarding Terumo's obligation to provide certain documents and information to Tureski (Count II) focuses on Terumo's refusal to do so at Tureski's request. D. 7 ¶¶ 74-78. Similarly, Tureski addresses this counterclaim together with his counterclaim for specific performance ordering Terumo to provide Tureski with those documents and the information he requested (Count IV). D. 7 ¶¶ 88-93; D. 140 at 26-28. The Court will consider each set of counterclaims in turn.

---

[2] The Agreement provides, in relevant part, that Delaware law applies, D. 128-1 at 52 (Section 9.2), and the parties do not dispute that it does. D. 126 at 12; D. 140 at 11.

[3] To the extent Terumo argues that Tureski is estopped from pursuing its counterclaims in light of the Court's ruling on Terumo's declaratory judgment claim, D. 126 at 19 & n.15, the nature of Terumo's claim—and the Court's ruling itself—makes clear that Tureski would not be foreclosed from arguing that Terumo failed to live up to its contractual obligations in regard to its commercially reasonable efforts, even if such efforts were capped at $6,000,000. D. 60 at 9.

A.     **Terumo's Failure to Use Commercially Reasonable Efforts (Counts I & III)**

According to the applicable provision in the Agreement, "[Terumo] and the Surviving Corporation agree to use Commercially Reasonable Efforts to effectuate and fund the CLI Development Plan with a commitment to provide up to $6,000,000 in funding for the CLI Development Plan . . . ." D. 128-1 at 14-15 (Section 1.6(c)(ii)); see id. at 12 (Section 1.6(b)(xi)). Tureski and Terumo's dispute is not a factual one in that Tureski does not appear to challenge whether Terumo's calculations of over $6 million in costs relating to the CLI Development Plan are incorrect. See D. 140 at 12-20. Rather, Tureski asserts that Terumo improperly included certain categories of costs in its calculations such that Terumo did not satisfy the $6 million funding obligation and thus breached the Agreement. See id. at 12-13.

Tureski argues that Terumo misinterprets its funding obligation by "including any and all costs associated with the CLI Pivotal Clinical Trial," id. at 12, where the parties' actions and negotiations indicate that they "did not intend the funding obligation to include Harvest's internal employee compensation, travel and entertainment expense and other operation costs and expenses," id. at 12-13. Tureski asserts instead that "the $6 million funding commitment in the Agreement . . . is comprised of four categories of funding: (1) per patient costs to be paid by the clinical sites in excess of the costs paid through Medicare; (2) third party monitoring and analytics consulting services costs; (3) CMS reimbursement consulting services costs; and (4) the costs associated with Drs. Thomas O'Donnell and Mark Iafrati." D. 127 ¶ 198; D. 131 ¶ 198; see D. 140 at 16-17 & n.7. In essence, Tureski asserts that the term "funding" as used in the Agreement is ambiguous and thus requires the Court to examine extrinsic evidence. See D. 140 at 12-15.

Under Delaware law, "the threshold inquiry when presented with a contract dispute on a motion for summary judgment is whether the contract is ambiguous." Unwired Planet, Inc. v.

Microsoft Corp., No. 14-cv-967-SLR, 2016 WL 3398409, at *5 (D. Del. June 15, 2016) (citation and internal quotation marks omitted). An ambiguity exists only when a contract is fairly susceptible to two or more reasonable interpretations. Rossi v. Ricks, No. 1747-CC, 2008 WL 3021033, at *2 (Del. Ch. Aug. 1, 2008). Delaware law follows the "'objective theory' of contracts" such that "a contract's construction should be that which would be understood by an objective, reasonable third party." NBC Universal v. Paxson Commc'ns Corp., No. Civ. A. 650-N, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005) (citation omitted); see Cont'l Warranty, Inc. v. Warner, 108 F. Supp. 3d 256, 260 (D. Del. 2015) (describing the "true test" as "not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant" (internal quotation mark and citation omitted)). A contract or term is not ambiguous simply because the parties disagree on the meaning. See Matulich v. Aegis Commc'ns Grp., Inc., 942 A.2d 596, 600 (Del. 2008) (citation omitted). "[C]ourts interpreting a contract will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions." In re Viking Pump, Inc., No. 518, 2016 WL 4771312, at *8 (Del. Sept. 12, 2016) (citation and internal quotation marks omitted). "Where a contract is plain and clear on its face, the writing itself is the sole source for gaining an understanding of intent." Wilmington Firefighters Ass'n, Local 1590 v. City of Wilmington, No. CIV.A. 19035, 2002 WL 418032, at *6 (Del. Ch. Mar. 12, 2002). That is, "[i]f a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity." Eagle Indus., Inc. v. DeVilbiss Health Care, Inc., 702 A.2d 1228, 1232 (Del. 1997) (citation omitted).[4]

---

[4] While Terumo emphasizes the importance of the integration clause in the Agreement, D. 146 at 9, if the Court determines the term at issue is ambiguous it may consider extrinsic evidence despite such a clause, see Simon-Mills II, LLC v. Kan Am USA XVI Ltd. P'ship, No. CIV.A. 8520-VCG,

The term "funding" as used in Section 1.6—or otherwise—is not defined in the Agreement. "Under well-settled case law, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract." Lorillard Tobacco Co. v. Am. Legacy Found., 903 A.2d 728, 738 (Del. 2006).[5] "This is because dictionaries are the customary reference source that a reasonable person in the position of a party to a contract would use to ascertain the ordinary meaning of words not defined in the contract." Id. "There may be more than one dictionary definition, and parties may disagree on the meaning of the definition as applied to their case, but if merely applying a definition in the dictionary suffices to create ambiguity, no term would be unambiguous." Id. at 740 (internal quotation marks and citation omitted).

According to Black's Law Dictionary, funding is defined as "3. The provision or allocation of money for a specific purpose, such as for a pension plan, by putting the money into a reserve fund or investments" and "4. The provision of financial resources to finance a particular activity or project, such as a research study." *Funding*, Black's Law Dictionary (10th ed. 2014). The Oxford English Dictionary defines funding as "1. Money provided, especially by an organization or government, for a particular purpose." *Funding*, Oxford English Dictionary, https://en.oxforddictionaries.com/definition/funding (last accessed on May 1, 2016). The Cambridge American Content Dictionary defines funding as "money made available for a

---

2014 WL 4840443, at *14 & n.111 (Del. Ch. Sept. 30, 2014) (citation omitted).

[5] Neither party asserts that "funding" has a "'gloss' in the [relevant] industry" and thus under Delaware law the term "should be construed in accordance with its ordinary dictionary meaning." See Lorillard Tobacco Co., 903 A.2d at 740 (internal quotation mark and citation omitted). While Tureski argues that he and "others were well aware, through personal experience and general industry knowledge, that the total all-inclusive costs for a clinical trial from start to completion was typically tens (or even hundreds) of millions of dollars," D. 140 at 17-18, this does indicate that the term "funding," as used in the Agreement, has a specific meaning in the industry.

12

particular purpose," *funding*, Cambridge American Content Dictionary, http://dictionary.cambridge.org/us/dictionary/english/funding (last accessed on May 1, 2017) and the Cambridge Business English Dictionary defines it to mean "money given by an organization or a government for a particular purpose," *funding*, Cambridge Business English Dictionary, http://dictionary.cambridge.org/us/dictionary/english/funding (last accessed on May 1, 2017). Likewise, the Business Dictionary, defines funding as "1. Providing financial resources to finance a need, program, or project. In general, this term is used when a firm fills the need for cash from its own internal reserves, and the term 'financing' is used when the need is filled from external or borrowed money." *Funding*, Business Dictionary, http://www.businessdictionary.com/definition/funding.html (last accessed on May 1, 2017).[6]

These broad definitions lead the Court to conclude that an objective, reasonable third party would read the term "funding" in the clause "funding for the CLI Development Plan" as including the monies and financial resources Terumo expended for, or made in provision of, the CLI Developmental Plan. That is, considering the dictionary definitions of "funding," those monies and financial resources—whether in the form of the salaries of Harvest personnel working full-time on the CLI Pivotal Clinical Trial and their incurred travel and entertainment expenses, or the costs of "external" third parties such as InVentiv and their expenses, see, e.g., D. 127 ¶¶ 78-83, 118-22; D. 131 ¶¶ 78-83, 118-22—are properly included towards Terumo's $6 million funding

---

[6] The Supreme Court has considered and described this source as a "colloquial business authorit[y]." See Vance v. Ball State Univ., __ U.S. __, 133 S. Ct. 2434, 2444 & n.5 (2013); see also In re Filene's Basement, No. 11-13511-KJC, 2014 WL 172137, at *5 (Bankr. D. Del. Jan. 15, 2014) (considering the source).

13

obligation as "funding for" the CLI Developmental Plan. Notably, Tureski's proposed interpretation—the four categories of funding—is not supported by any of the dictionary definitions and, therefore, it is difficult to conclude, as he urges, that a reasonable third party would not read the term in such a way. Cf. Seaford Golf & Country Club v. E.I. duPont de Nemours & Co., 925 A.2d 1255, 1261-62 (Del. 2007) (finding term ambiguous where dictionary definitions supported both parties' respective interpretations).

Reading the Agreement as a whole, see In re Viking Pump, Inc., 2016 WL 4771312, at *8, Tureski's interpretation of "funding" is also not reasonable given that there is no part of the Agreement that includes or alludes to the four categories of funding he proposes such that an objective third party would not read them into the term. The parties otherwise defined the scope or excluded specific costs and expenses where certain broad terms are used in the Agreement. D. 128-1 (e.g., Sections 1.6(b)(x), 5.7(a), 8.2(a)); 128-2 (e.g., Schedule 3.9 ¶ 195); D. 126 at 17-18; see 2009 Caiola Family Trust v. PWA, LLC, No. C.A. 8028-VCP, 2014 WL 1813174, at *11 (Del. Ch. Apr. 30, 2014) (rejecting plaintiff's interpretation of the section at issue where, among other things, it was inconsistent with other sections of the agreement). As such, if the parties had intended to limit "funding," they could have done so as they had in other parts of the Agreement.

Even considering certain undisputed extrinsic evidence for background, the Court does not reach a different conclusion. "There may be occasions where it is appropriate for the trial court to consider some undisputed background facts to place the contractual provision in its historical setting without violating [the principle that extrinsic evidence may be considered only in the presence of contractual ambiguity]," however, "the trial court must be careful in entertaining background facts to avoid encroaching on the basic principles set forth herein." SI Mgmt. L.P. v. Wininger, 707 A.2d 37, 43 (Del. 1998) (brackets in original) (citation omitted). It is undisputed

that the parties to the Agreement were represented by counsel, D. 127 ¶¶ 25-27; D. 131 ¶¶ 25-27, that they went through multiple drafts of the Agreement and proposed changes to Section 1.6, D. 127 ¶ 23; D. 131 ¶ 23, and that the Agreement was modified numerous times between July 2011 and January 2014, D. 127 ¶¶ 33-39; D. 131 ¶¶ 33-39, but that the parties did not change Section 1.6 in regards to the funding obligation, D. 127 ¶ 32; D. 131 ¶ 32. While the forecasts and models to which Tureski points, D. 145 (Ex. 2), 145-3 (Ex. 5), 145-7 (Ex. 14), 132-16 (Ex. 16); see D. 140 at 16-17, estimate the costs for the CLI Pivotal Trial at around $6 million, they do not indicate how such costs are calculated. These forecasts and models list a category for SG&A—which purportedly includes the "salaries of [Harvest] employees," D. 132-26 at 5 (Curtin Dep., Apr. 19, 2016)—separate from the category for the CLI Pivotal Trial costs. D. 145 at 2, 11; D. 145-3 at 5, 9, 11; D. 145-7 at 4, 8, 10, 12; D. 132-16 at 4, 8, 10. There is no indication, however, that the salaries of those Harvest employees working fulltime on the CLI Pivotal Trial are included in the SG&A category rather than in in the trial costs category. Indeed, there is no indication how the trial costs were calculated in certain of these forecasts and models as they simply list "CLI" with a corresponding number for the applicable year. D. 145 at 11; D. 145-3 at 11; D. 145-7 at 12. Those forecasts, which do break out trial costs, do not define what comprises the categories of "monitoring" or "Consulting." D. 145-7 at 10; D. 132-16 at 10. While the parties dispute whether Terumo instructed that these forecasts and models exclude the salaries of Harvest employees and other internal costs, D. 141 ¶ 18; D. 147 ¶ 18, the forecasts and models do not indicate this purported instruction as an "[a]ssumption" or otherwise, D. 145 at 4; D. 145-3 at 4; D. 145-7 at

15

12; D. 132-16 at 4, 10.[7] As such, the forecasts and models do not provide background evidence in support of Tureski's narrower interpretation of Terumo funding obligation.

In sum, Tureski's interpretation asks too much of the otherwise broad term. See Rossi, 2008 WL 3021033, at *1 (Del. Ch. Aug. 1, 2008) (noting that "[u]nder Delaware law, courts interpret contracts to mean what they objectively say" (internal quotation marks and citation omitted)). Given the plain language of the entire Agreement, an objective, reasonable third party would not understand "funding" to mean the limited four categories Tureski proposes. Accordingly, based upon the Court's interpretation of the term "funding" in Section 1.6, and considering Tureski does not otherwise challenge Terumo's cost calculations, no reasonable jury could conclude that Terumo breached the $6 million funding obligation provided in the Agreement.

Tureski also appears to base his breach of contract counterclaims upon the theory that Terumo breached its obligation to use the "same level of effort" as that normally used to develop products internally. See D. 140 at 22-25. While the Court's previous decision on Terumo's declaratory judgment claim contemplated such an argument, D. 60 at 13, it is unclear that such a counterclaim even is alleged in Count I, D. 7 at 19-20. Tureski's counterclaims in Count I are silent as to Terumo's level of effort in comparison to that it expends internally on similar products. Id. The evidence Tureski bases his arguments upon as to Terumo's level of effort, D. 140 at 22-25, however, as pointed out by Terumo, D. 146 at 18, is not contained in any of its Local Rule 56.1 Statements and these facts are thus not properly before the Court, see Schultz v. Kelly, 188 F.

---

[7] It is, however, also undisputed that "[i]nternal Harvest salaries and expenses are not included in the 'Original Model'" listed in a May 2014 CLI Budget. D. 141 ¶¶ 85, 89; D. 147 ¶¶ 85, 89; see D. 132-9. There is no evidence, however, that this single budget is reflective of the parties' mutual intent as to the meaning of the term "funding" at the time they entered into the Agreement. See Eagle Indus., Inc., 702 A.2d at 1233 & n.11.

Supp. 2d 38, 50 (D. Mass. 2002) (deeming a purported fact from an affidavit cited in plaintiff's memorandum of law but not included in their Local Rule 56.1 statement as not properly before the court). Even then, no reasonable jury could conclude from the facts presented in Tureski's opposition regarding the purportedly over-budget expenditures for the off-schedule products named "Anaconda" and "Misago," D. 140 at 23-25, that Terumo failed to expend the same level of effort on the Plan. There are no facts regarding the stage of development, product life, market and profitability of those products to compare with the Plan. See, e.g., Banas v. Volcano Corp., 47 F. Supp. 3d 941, 946-47 (N.D. Cal. 2014) (entering summary judgment in favor of defendant for their alleged failure to use "commercially reasonable efforts" where there was a lack of evidence regarding the respective market potential of the products at issue); see D. 146 at 21.

Tureski also argues that Terumo breached the Agreement by excluding Tureski, as Plan Manager, from involvement with the Plan. D. 7 ¶¶ 65, 69; D. 140 at 25-26. Tureski relies upon Sections 1.6(b)(v) and 1.6(b)(xxvi) as the basis for the obligations which Terumo breached. As Terumo argues, D. 146 at 25-26, these sections, at best, create an obligation for Tureski rather than Terumo. Section 1.6(b)(v) states, in relevant part, in defining "CLI Development Plan," that "[t]he CLI Development Plan shall be directed within its scope by the Plan Manager in reasonable consultation with [Terumo]." D. 128-1 at 11. Section 1.6(b)(xxvi) defines "Plan Manager" as "Gary D. Tureski unless he is unable or unwilling to perform the services contemplated herein . . . ." Id. at 14. Additionally, Section 1.6(c)(i) states that "the Plan Manager agrees to use best efforts to effectuate the CLI Development Plan" and submit certain applications to the FDA depending on the circumstances. Id. Where there are no obligations placed upon Terumo in these sections, Tureski's counterclaims fail where he cannot establish the first element of a breach of contract cause of action. See RoadSafe Traffic Sys., Inc., 2011 WL 4543214, at *13. Likewise, a breach

17

of these sections do not fall within the definition of a "Payment Acceleration Event," D. 128-1 at 14 (Section 1.6(b)(xxv)), entitling Tureski to Earnout Payments, id. at 15 (Section 1.6(e)). Tureski does not otherwise point to any damages resulting from the purported breach. D. 140 at 22-26. Tureski thus also fails to establish the damages element of his breach of contract counterclaims. See RoadSafe Traffic Sys., Inc., 2011 WL 4543214, at *13. Accordingly, no reasonable jury could find in Tureski's favor on these counterclaims and Terumo is entitled to summary judgment.

As discussed above, where the Court grants summary judgment in favor of Terumo on Count I (counterclaim for breach of contract), Tureski's counterclaim for a declaratory judgment, Count III—dependent upon prevailing on Count I—in turn fails as well.

### B. Terumo's Failure to Comply with Requests for Information (Counts II & IV)

Tureski asserts that Terumo breached certain aspects of Sections 1.6(d) and 5.8 of the Agreement which obligate Terumo to provide Tureski with, or give him access to, certain documents in Terumo's possession or control. D. 7 ¶¶ 74-77; D. 140 at 26-28. The applicable portion of Section 1.6(d) that Tureski points to provides:

> The Plan Manager, the Sellers' Representative, and the Purchaser each agree, to the extent such information is in their possession or control, to provide such other party with copies of (1) all material documents relating to the FDA Trials Patients . . . (2) all correspondence between [Harvest] and the applicable regulatory authorities . . . (4) annual financial statements of [Harvest] . . . within 15 business days after the final auditor's sign off, and (5) as to Purchaser only, to provide the Sellers' Representative and his representatives with access to all information reasonably necessary to evaluate the performance by [Harvest] . . . .

D. 128-1 at 15. Similarly, the relevant portion of Section 5.8 Tureski points to states:

> Subject to compliance with contractual obligations and applicable laws and regulations, following the Closing, each Party shall afford to the other Party and to the other Party's Affiliates . . . reasonable access . . . to all non-privileged records, books, contracts, instruments, documents, correspondence, computer data and other data and information (collectively, "Information") within the possession or control of such Party or its Affiliates, relating to the Business, insofar as such access is reasonably required by the other Party.

D. 128-1 at 39.

Tureski asserts that after leaving Harvest in March 2013, he was not provided any annual financial statement as required by Section 1.6(d)(4) of the Agreement. D. 140 at 27-28. Likewise, in June 2014, Tureski asserts that he was not provided information regarding Harvest and the CLI Pivotal Clinical Trial that he had requested. Id. While Tureski may be correct that litigation, discovery and the resulting production of documents in satisfaction of his prior requests under the Agreement does not moot his breach of contract counterclaims regarding the same, his counterclaim for specific performance of same (Count IV) is moot absent any indication that Tureski was not provided the documents and information he had requested.

Even assuming, however, that Terumo breached Section 5.8 of the Agreement, Tureski does not identify any damages resulting from the breach and this counterclaim fails. See RoadSafe Traffic Sys., Inc., 2011 WL 4543214, at *13. A breach of Sections 1.6(d)(3) or (4) constitutes a Payment Acceleration Event, as defined in Section 1.6(b)(xxv)(a), "provided that in the event of a breach of sections (a) or (b) above, the Sellers' Representative shall give [Terumo] and [Harvest] written notice of such breach, and the Payment Acceleration Event shall not occur unless the breach is not cured within 30 days of such written notice." D. 128-1 at 14. According to Section 1.6(e), a Payment Acceleration Event triggers the payment of any remaining milestone payments with interest. Id. at 15. Because Tureski does not provide any evidence indicating that he provided written notice of a breach of Section 1.6(d)(3) or (4) to Terumo and Harvest, D. 140 at 26-28, the 30-day cure period did not run such that any breach of those sections did not constitute a Payment Acceleration Event. Tureski is thus not entitled to any payments under Section 1.6(e) and he does not otherwise point to any other damages. D. 140 at 26-28. His contract counterclaims (Count II) again fail as to the damages element. See RoadSafe Traffic Sys., Inc., 2011 WL 4543214, at *13.

## VI. Conclusion

For the foregoing reasons, the Court ALLOWS Terumo's motion for summary judgment, D. 125, on all of Tureski's counterclaims (Counts I, II, III and IV).

**So Ordered.**

<u>/s/ Denise J. Casper</u>
United States District Judge